IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00517-DDD

UNITED STATES OF AMERICA,

       Plaintiff,

v.

TONY JACKSON,

       Defendant.

---

## UNOPPOSED MOTION FOR BELOW-GUIDELINE SENTENCE

---

Defendant, Tony Jackson ("Mr. Jackson"), by and through undersigned counsel, David E. Johnson, hereby files this Unopposed Motion for Below-Guideline Sentence, thereby requesting a sentence of <u>time served</u> (167 days, or approximately 24 weeks at the time of sentencing)[1] followed by <u>three years of supervised released</u>, and in support thereof states as follows:

### INTRODUCTION

Mr. Jackson agrees with the current sentencing recommendation of the Probation Office. *See* Doc. 33 ("PSR") at R-1.[2]  Time served is a sufficient sentence to comply with Section 3553(a).  Any other imprisonment term would be greater than necessary.  Importantly, in coming to that conclusion, Mr. Jackson agrees that a three-year term of supervision is also necessary, including the special conditions recommended in the PSR. *Id*. at R-2.

---

[1]  November 24, 2019 to and including May 8, 2020 is 167 days.

[2]  A restitution request has not yet been received, and thus Mr. Jackson reserves argument on that issue.

Undersigned counsel has conferred with Assistant United States Attorney Emily Treaster, who explained this motion is unopposed.  As requested by the parties and the probation office, this Court should impose a below-guideline sentence of time served followed by three years supervised release.

## ARGUMENT

When Mr. Jackson got on an airplane on November 24, 2019, it was not a common occurrence for him.  In fact, it was only the second time in his life he was ever on a plane.  The first time occurred the evening before.  Specifically, the first flight Mr. Jackson ever took was on the evening of November 23, 2019, when he flew from Chicago to Las Vegas, to assist a family friend who was in need.  The second time he was on a plane was for the return trip from Las Vegas to Chicago, the next day, on the morning of November 24, 2019. Air travel was not something Mr. Jackson was comfortable doing. And Mr. Jackson was making his first round-trip flight on no sleep.

On his second-ever flight, Mr. Jackson had no intention of causing a disturbance.  Mr. Jackson was not intending to be disruptive or to cause any harm. Rather, he had a genuine subjective concern for his safety.  When talking with the two passengers sitting next to him, and also while conveying his fear to the flight attendants, he was consistent in expressing subjective fear for his safety.  Fear that there was a weapon on the plane. "He said he felt threatened," wrote one flight attendant in a handwritten statement. Another wrote how Mr. Jackson said "my life is in danger."  His fear overcame him. He panicked. Ultimately, a decision was made to place Mr. Jackson in flex-cuffs.  When asked, Mr. Jackson put out his hands; he did not resist. He allowed the restraints to be placed on him without any struggle.

2

In the few moments of video the government provided with Mr. Jackson on the flight, he had a genuine look of anxiety and desperation on his face. He was scared, begging and pleading for safety. He was perspiring. *See* PSR at ¶ 19. At one point in the flight, Mr. Jackson was crying out of concern. However, once law enforcement arrived and approached Mr. Jackson, he was calm and cooperative.

In fact, during his interactions with law enforcement both on the plane and off, Mr. Jackson was always calm and cooperative. That was Mr. Jackson's desire the entire time: to make the authorities aware of the risk he felt was present, and to make sure the plane landed safely. As one officer wrote in his report: "Upon contact he [Mr. Jackson] was calm and in control."

The first time Mr. Jackson is viewed on law enforcement body camera footage, he was calmly sitting in his seat, often talking with the male sitting next to him. After the other passengers had deplaned, Mr. Jackson was escorted off the plane, walking off on his own free will; he did not have to be forcibly removed. The other passengers deplaned to the gate area, and Mr. Jackson was taken outside to speak with law enforcement on the ground, just outside of the plane. Shortly after getting outside, Mr. Jackson spoke freely with law enforcement. When asked what was going on, he immediately explained how he thought he saw a knife on the plane. A few minutes later, with a police officer sitting next to him in the back seat of a police car, he reiterated his concern: "I kept telling the flight attendant that I saw the lady, that I thought she had a knife. . . . I didn't want anybody to get hurt. I didn't want to get hurt."

Law enforcement had been told that Mr. Jackson did not assault or make any threats to anyone. Mr. Jackson never made physical contact with anyone on the plane, and he did not physically harm anyone. Upon arriving at the gate, one male flight attendant answered the

officer's questioning: "No, he did not assault anybody." An interviewed-passenger confirmed that to be true: "nothing physical," she affirmed. She later added that "he kept screaming out."

Outside of the plane, local law enforcement tried to figure out if a crime had even occurred. Not within earshot of Mr. Jackson, one officer was overheard on the phone asking: "There's got to be a charge? . . . I mean, I don't know." The officer who had been speaking with Mr. Jackson responds to that officer: "He was convinced he saw a knife. He was trying to let people know."

One local Denver Police Department officer made it clear that no local or state offense had been violated, explaining that his Sergeant told him how "We don't have any charges against him." The other officer confirms: "He didn't assault anyone. . . . He didn't threaten anybody." That officer went on to explain how Mr. Jackson told him he was "scared to death."

While no local crime occurred, the federal offense of interfering with a flight attendant did. Specifically, Mr. Jackson admits his conduct was intimidating to flight attendants, and it interfered with the attendants' ability to do their job. *See* PSR at ¶ 14. While that is what regrettably occurred, that was never Mr. Jackson's intent. Nor does the law require him to have *intended* any intimidation in order for him to be guilty of this offense. "In order to intimidate [within the meaning of 49 U.S.C. § 46504], there is no requirement that the person intend to intimidate." Doc. 29 at 4. Nor does the guideline calculation differentiate between intentional intimidation versus unintentional intimidation.

For some of the passengers on the plane, this was undoubtedly a scary incident.[3] For others, it was a significant inconvenience, the plane having been temporarily diverted. Some

---

[3] T.G. said she was having a panic attack. An officer followed-up with a question: "But you're not injured in any way?", and she responded "No."

passengers were upset with Mr. Jackson.[4]  Others felt bad for him.[5]  Mr. Jackson has great

remorse for what others on the plane went through. At the same time, it was also a scary time for

him.  Mr. Jackson was scared for his safety and the safety of other passengers.  As he told the

officer who was sitting in the back seat of a police car with him: "If I'm mistaken, I apologize,

but I just wanted to make sure everyone was safe."

Mr. Jackson was interviewed by federal law enforcement and waived his *Miranda* rights.

Again, he was calm throughout the interview.  He explained he meant no harm to anyone, but he

thought he saw a weapon – a three-inch metal knife – on the plane.  When the agent explained to

Mr. Jackson that it is uncommon and a "big deal" for a plane to be diverted, Mr. Jackson

explained: "I just thought I saw somebody with a knife, and I was just trying to do the right

thing. Make sure nobody on that plane had a knife that was going to hurt somebody.  That's all I

was trying to do." He then reiterated his fear and returned to the issue of safety.  "I just wanted to

be safe, and I wanted the passengers on there to be safe."  He concluded by stating all he wanted

was to make sure the plane landed safely. As the PSR concluded: "[T]here does not seem to be

any evidence that the defendant had any intentions of diverting the plane when he initially

boarded." PSR at R-3.

---

[4]  One passenger told Mr. Jackson: "You f@#king suck! Just letting you know." She said that to
him while deplaning, walking past Mr. Jackson as he was calmly sitting in his seat.  Mr. Jackson
did not respond. He remained calm said nothing in return.

[5] One passenger specifically told an officer that she was crying because she felt bad for Mr.
Jackson: "I just feel bad [for him]."

The federal agent also learned during the interview that it been "a day and a half" since Mr. Jackson last slept.[6] He added: "Stuff can get pretty delusional in a day and a half." PSR at ¶ 25. In any event, Mr. Jackson agrees with the PSR's statement that evaluations of his mental health "may prove to be a benefit for [him]." *Id.* at R-3.

At the time of sentencing, Mr. Jackson will have been in continuous confinement for approximately 24 weeks. He has no disciplinary issues while in custody. PSR at ¶5. In fact, he is assigned a work duty, *id.*, which not all inmates have the privilege of getting. In the time of the corona virus, his custodial time has been stressful.

Mr. Jackson has been diagnosed with high blood pressure (hypertension). PSR at ¶ 80. This is particularly concerning, given the current pandemic, where studies have shown "people with high blood pressure are among those who are at heightened risk for more severe complications should they contract Covid-19."[7]

Of particular concern to Mr. Jackson is returning to be with his family, including two minor daughters, ages 6 and 8. *See* PSR at ¶ 73; Doc. 33-2 at 8 (photograph). Mr. Jackson has a "really good" relationship with his mother and six sisters, all who reside in the Chicago-area. They remain supportive. He also cares deeply for his daughters. In fact, his daughters were at the forefront of his mind when he was concerned for his safety on the flight (repeatedly asking to call them), and they remain of central importance to him while in custody. Both when in and out

---

[6] Mr. Jackson made that statement at approximately 10:15 am on November 24, 2019. A day-and-a-half prior would have put Mr. Jackson's last sleep occurring during the evening of November 22, 2019.

[7] Ryan Prior, *Those With High Blood Pressure are at a Greater Risk for Covid-19* (Apr. 17, 20202), *at* https://www.cnn.com/2020/04/17/health/blood-pressure-coronavirus-wellness/index.html

of custody, Mr. Jackson makes sure to spend time with his daughters.  As his fiancé explained: "He has a great co-parenting relationship with their mother."[8]  She also described how Mr. Jackson "has a close connection to the girls and is very in tune to their needs." Of utmost importance to him is to return to them once released from custody.

As recognized by the Probation Office in making its time-served recommendation, the sentence imposed by this Court is not the only punishment Mr. Jackson will receive as a result of this case.  Mr. Jackson "is currently on parole supervision with the Illinois Department of Corrections ["IDOC"], commencing on May 20, 2019." PSR at R-3.  It is this fact that increases Mr. Jackson from criminal history V to VI. *See* PSR at ¶¶ 62-64.  After his arrest in this case, a parole warrant was issued based on this case.  *See id*. at ¶ 59. Thus, a time-served sentence is unlikely to result in Mr. Jackson's immediate release from custody.  Instead, the IDOC detainer will likely be honored, *see* PSR at 1, and Mr. Jackson will have to answer the parole warrant and the consequences that follow. For this Court's sentence, time served should be imposed.

Finally, as noted by the PSR, it is appropriate to note that Mr. Jackson does have numerous prior felony convictions.  *See* PSR at R-3.  However, it should also be noted that none of his prior convictions (including misdemeanors or felonies) involved physical harm to a victim. Further, none involved a firearm or any other weapon.  As his aunt explained: "Tony would not hurt anyone." Doc. 33-2 at 6.  Numerous letters were submitted on Mr. Jackson's behalf.   They describe Mr. Jackson as someone who is helpful and compassionate. His fiancé described how Mr. Jackson "has a strong sense of family, a sensitive heart, and a deeply rooted faith." Counsel's experience with Mr. Jackson is consistent with that description.

---

[8]  A letter from Ms. Gomez, *see* PSR at ¶ 74, was provided to the Probation Office after initial disclosure of the PSR.

## CONCLUSION

WHEREFORE, after considering the history and characteristics of Mr. Jackson, and the unique nature and circumstances of this case, this Court should impose a sentence of <u>time served, followed by 3 years of supervision</u>. 18 U.S.C. § 3553(a)(1).  Such a sentence would be sufficient but not greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).   It would also take into consideration the range of available sentences and the Commission's policy statements. 18 U.S.C. § 3553(a)(3), (4), and (5). And under the unique facts of this case, such a sentence would not result in an unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6).

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/ David E. Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
Attorney for Defendant


*I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III.A.1.*

8

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2020, I filed the foregoing **UNOPPOSED MOTION FOR BELOW-GUIDELINE SENTENCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Emily May Treaster, Assistant United States Attorney
E-mail:  Emily.treaster@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Tony Jackson (via U.S. mail)

s/ David E. Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
Attorney for Defendant

9